_____

SCOTT E. WOODWORTH and
LYNN M. WOODWORTH,

                                Plaintiffs,              No. 05-CV-6344 CJS

        -vs-
                                                         DECISION AND ORDER
ERIE INSURANCE COMPANY,

                                Defendant.


_____


## APPEARANCES

For plaintiffs:          Howard E. Berger, Esq.
                         Duke, Holzman, Photiadis & Gresens, LLP
                         1800 Main Place Tower
                         Buffalo, New York 14202

For defendants:          R. Anthony Rupp, III, Esq.
                         Marco Cercone, Esq.
                         Rupp, Baase, Pfalgraf, Cunningham
                         & Coppola LLC
                         1600 Liberty Building
                         Buffalo, New York 14202


## INTRODUCTION

Plaintiffs are suing to recover amounts which they maintain they are owed under a homeowner's insurance policy issued by Defendant.  Now before the Court is Defendant's motion for partial summary judgment on Plaintiff's claim seeking additional living expenses.  For the reasons that follow, the application is granted in part and denied in part.

1

BACKGROUND

On or about December 18, 2002, Defendant issued Plaintiffs an insurance policy, covering plaintiffs' home located in Canandaigua, New York.  The policy purports to insure the home in the amount of $221,000.00., and Plaintiffs paid premiums on that amount.  The policy, however, requires Defendant to pay up to, *inter alia*, "the replacement cost at the time of the loss."  This has led to an intense disagreement between the parties, inasmuch as Plaintiffs contend that the replacement cost is essentially double the amount for which they insured the home.  Defendant maintains that Plaintiffs misrepresented the value of the home at the time they purchased the policy, or that they are now misrepresenting the replacement value.  Plaintiffs respond that they never indicated that the house was worth only $221,000.00, and that this amount was selected by the insurance agent who sold them the policy.  Plaintiffs further contend that they built the home for approximately $280,000.00, which is well below the home's actual value and replacement cost, because they acted as their own general contractor, which resulted in considerable savings.  Additionally, Plaintiffs maintain that Defendant has treated them unfairly during the claims adjustment process, and is ignoring its obligations under the policy.  Against this backdrop of mutual distrust, this dispute, which seemingly should have been settled long ago, has dragged on for more than seven years.

The policy states that, in the event of a loss, Defendant will pay Plaintiffs either the actual cash value of the property, or, if Plaintiffs replace or rebuild the property, the cost of replacing or rebuilding.  In that regard, in pertinent part, the policy states:

> Loss to Dwelling Coverage, Other Structures Coverage and Personal
> Property Coverage will be settled on a replacement cost basis, without

deduction for depreciation.

  a. Under Dwelling Coverage and Other Structures Coverage:

1) Payment will not exceed the smallest of the following amounts:

-any amount of insurance applying to the building;

- the replacement cost of that part of the building damaged for equivalent construction and use on the same premises;

-the amount actually and necessarily spent to repair or replace the damaged building;

2) We will pay no more than the actual cash value of the damage until the actual repair or replacement is completed.

Erie Insurance Company Policy #Q60-6800396.  The policy also states, in pertinent

part, that Defendant will pay certain living expenses:

LOSS OF USE COVERAGE – OUR PROMISE

If an insured property loss makes your residence premises uninhabitable, we will pay all reasonable additional living expenses while you and members of your household reside elsewhere.

Payment shall be for the shortest time required to repair or replace the premises or, if you choose, for you to permanently relocate.  These payments will not exceed a 12 month period.

*Id*.  The policy further provides for an appraisal process, in the event the parties

disagree as to an amount of loss:

2. APPRAISAL

If you and we fail to agree on the amount of loss, either party may make written demand for an appraisal.  Each party will select an appraiser and notify the other of the appraiser's identity within 20 days after the demand is received.  The appraisers will select a competent and impartial umpire. If the appraisers are unable to agree upon an umpire within 15 days after both appraisers have been identified, you or we can ask a judge of a court of record in the state where your residence premises is located to select an umpire.

The appraisers shall then set the amount of loss. If the appraisers submit a written report of an agreement to us, the amount agreed upon shall be the amount of loss. If they cannot agree, they will submit their difference to the umpire. A written award by two [sic] will determine the amount of loss.

*Id*. Such appraisal clause is statutorily required in fire insurance policies sold in New York, and is binding on both the insurer and insured, pursuant to New York Insurance Law ("Insurance Law") § 3404(e) & (g).

On August 16, 2003, Plaintiffs' home was completely destroyed by an explosion and fire, apparently caused by a defective tankless water heater. On October 14, 2003, Plaintiffs submitted a statement of loss, indicating that the replacement cost of the home was $498,745.50. On November 13, 2003, Defendant informed Plaintiffs that it rejected their proof of loss forms, "based on the amount of your demand." Affidavit of Nancy Mowins ("Mowins"), Docket No. [#82-13], Ex. C. Instead, Defendant paid Plaintiffs the sum of $308,183.00, which Defendant maintains was the actual cash value of the home. In that regard, Defendant estimated that the total replacement cost would be $399,565.50, and then calculated actual cash value by applying a depreciation factor. Defendant withheld the difference between the alleged actual cash value and the replacement cost, to be paid when and if Plaintiffs rebuilt the house at a cost exceeding that amount.[1] Defendant calculated the estimated replacement cost, based on the opinion of a professional builder, Len Scofero ("Scofero"), who indicated that the house could be rebuilt for $381,935.50. Defendant took that figure, and added certain expenses, such as landscaping, to arrive at the replacement cost set forth

---

[1] The actual cash value and replacement value are interrelated, since Defendant apparently arrived at its estimated actual cash value by taking the estimated replacement cost, $399,565.50, and applying a depreciation factor. Mowins Affidavit, Exhibit A.

4

above.

Plaintiffs argue that Defendant's estimates were too low.  With respect to replacement cost, Plaintiffs maintain that Scofero's estimate was incomplete, because it omitted or undervalued many elements of the destroyed house.  Scott Woodworth Affidavit, [#85-13], Ex. B.   For example, on January 7, 2004, Plaintiffs told Defendant that Scofero's estimate had  "thirty-one (31) incorrect or omitted items."  Defendant's claims adjuster, Mowins, states that, after she received Plaintiffs' list of items that were allegedly omitted from, or undervalued in, Scofero's estimate, she discussed it with Scofero, "to be sure that we did include everything that was in the house, that the insureds claim [was] in the house." Mowins Dep. 103-104.  According to Mowins, Scofero responded that his estimate was sufficient to rebuild the house as before, even with Plaintiffs' list of allegedly omitted items. Mowins Dep. 104.[2]  Scofero, however, disagrees.  At his deposition, Scofero testified that he prepared his estimate based on specifications that were provided to him by Mowins. Scofero Dep. 26 ("She had mentioned what was in the home as far as upgrades and options."). Scofero stated that subsequently, after he submitted his estimate,  no one advised him that it omitted or undervalued certain items. Scofero Dep. 46, 49, 51.  Scofero also stated that prior to his deposition, he never saw Plaintiffs' list of "Incorrect and Omitted Items." Scofero Dep. 47, 49-50.  Scofero further indicated that, if he had been advised that Plaintiffs' home actually contained the allegedly omitted items, he would have prepared a supplemental estimate. Scofero Dep. 68.

---

[2]Mowins subsequently indicated, on the errata sheet to her deposition transcript, that such statement was not "accurate." Berger Aff., Ex. E.

From Defendant's perspective, a significant sticking point in this case has been its insistence that Plaintiffs provide detailed records concerning the materials used and the actual cost to build the home, and Plaintiff's refusal to do so.  In that regard, Defendant questions how the replacement cost urged by Plaintiffs could be realistic, since Plaintiffs purportedly built the house at a cost of only $280,000.00 two years earlier.[3]  Defendant asked Plaintiffs to provide documentation concerning the items and materials that they claim are omitted from Scofero's estimate.[4]  For example, on October 28, 2003, Mowins requested that Plaintiffs provide "verification as to your purchase of the items that were in [the] home at the time of the loss," including proof of purchase concerning various appliances, cabinets, marble tile, and marble and granite countertops. Scott Woodworth Aff. [#17-3], Ex. B.

Plaintiffs counter that they have submitted sufficient proof of their loss, and on this point, they rely on Scofero's estimate, supplemented with information concerning the items that they contend are missing or undervalued in such estimate.  For example, Plaintiffs state that they provided additional information on November 3, 2003 and January 7, 2004. See, Woodworth Aff. [#17-3], Ex. I, Letter of Scott Woodworth to Jeffrey Ludrof, dated March 5, 2004.  For example, on November 3, 2003, in response to Mowin's request described above, Plaintiffs provided her with invoices for certain

---

[3] *See, e.g.*, Rupp Affidavit dated Nov. 30, 2005, [#20-1], ¶ ¶ 8, 11 ("Plaintiffs' proof of loss was unaccompanied by any documentation that would explain why it would cost an additional $277,745.50 to replace their home only two years after it was originally built. . . .  During [an examination under oath] on May 6, 2004, Mr. Woodworth claimed that their entire residence was actually constructed for a total cost of $270,000, a figure that the plaintiffs have not been able to support and Erie has been unable to verify.").

[4] *See, e.g.*, Mowins Dep. 105-106; letter of R. Anthony Rupp III dated March 4, 2004 (requesting that, at examination under oath on April 2, 2004, Plaintiffs produce documentation including "estimates, contracts, appraisals, purchase orders, receipts, invoices, and bills of sale.").

items, such as marble tile and marble countertops, and also provided photographs of certain appliances, including a stove, refrigerator, microwave, and dishwasher. *Id*., Ex. B. Mowins responded that she needed additional information concerning the appliances, since photos were not sufficient. Apparently, though, Mowins later accepted such photographs as proof, at least with regard to the microwave and refrigerator, since she added those items onto Scofero's estimate. *Id*.

On October 8, 2004, Defendant informed Plaintiffs that it still needed additional information from them, stating, in pertinent part:

> Mr. Rupp [Defendant's attorney] will be sending you and your representative, NFA [National Fire Adjustment Co., Inc., the public adjuster firm retained by Plaintiffs], a letter next week outlining the items we need you to supply us with in order to further evaluate this claim. This will include the photos and receipts referred to in your voice mail. Mr. Rupp will comprehensively outline what will be needed to bring this claim to a conclusion. We encourage you to cooperate and supply us with all the needed documentation.

Letter of Jeffrey A. Ludrof dated Oct. 8, 2004. Subsequently, on October 13, 2004, Rupp asked Plaintiffs to provide, *inter alia*, "a detailed list of each and every contractor who assisted in the original construction of your home," "invoices and payment histories with respect to different portions of the work, as well as the base cost of materials used in constructing [the] home," banking records, records related to the original mortgage. See, Woodworth Aff. [#17-3], Ex. L. In that regard, Rupp asked Plaintiffs to provided signed authorizations, to allow him to obtain their banking and mortgage records. *Id*. Subsequently, Plaintiffs provided some of the information, explaining that they could not remember some of the contractors' information or where some of the materials were purchased. Additionally, Plaintiffs refused to provide six of the requested authorizations to Rupp, because they contended that they had already

provided information to Mowins. *Id.*, Ex. M.  Plaintiffs later relented and sent the authorizations.[5]

On February 10, 2005, Defendant informed Plaintiffs that it was still gathering "banking records, estimates, invoices, brochures, and other documents from dozens of sources with regard to the original construction of your home." *See,*  Woodworth Aff. [#17-3], Ex. M., Rupp letter dated Feb. 10, 2005.  Defendant added that, if the information it gathered suggested that "further discussions with you or your representatives are likely to lead to an agreement on the theoretical replacement cost value of your claim, you will be contacted accordingly." *Id.*  Otherwise, Defendant essentially indicated that Plaintiffs' claim for further payments was denied, and that any further discussion would take place when and if Plaintiffs rebuilt the house. *Id.*

In March 2005, Plaintiffs retained an attorney, Harry P. Begier, Jr. ("Begier"), who wrote to Defendant and demanded an appraisal concerning actual cash value and replacement cost:

> The purpose of an appraisal is to determine the Actual Cash Value and the Replacement Cost in a loss.  It is important to the Insured to establish the Replacement Cost in order to know how much money he can spend in rebuilding. . . . Your client's refusal to go to appraisal is clearly frivolous and constitutes bad faith.

---

[5]Plaintiffs generally opposed Defendant's attempt to determine the original cost of construction, arguing that it was irrelevant, since they had a replacement cost policy.  For example, Plaintiffs stated:"[Y]our present endeavor to recreate the original construction cost of my house is moot as I have a replacement cost policy.  The original construction cost of my house provides no valuable information to help settle my dwelling replacement cost claim." Woodworth Aff. [#17-3], Ex. M  Similarly, on December 16, 2004, Plaintiffs wrote to Defendant, in pertinent part: "Would you please explain to me the need to recreate the original construction cost of my house when I have a replacement cost policy with your company? [T]he original construction cost has no relevance to the replacement cost[.]" *Id.*  On January 19, 2005, Defendant's President & CEO responded, indicating that "the cost to construct your home and the payments that you have made to various contractors and vendors" was relevant to Defendant's determination as to "whether any further negotiations are warranted on the subject of the estimated replacement cost value of your home." *Id.*

*See*, Woodworth Aff. [#17-3], Ex. P.  Defendant responded that Plaintiffs were not entitled to an appraisal, since they had not yet submitted a valid replacement cost claim. *Id*.  Defendant further indicated that it was continuing to gather information concerning the original construction of Plaintiffs' house, and in that regard, it sent Begier proposed authorizations for Plaintiffs to sign, "to obtain copies of the statements from any credit cards that were used for [construction related] purchases during the period of construction." *Id*.  It is unclear in the record whether Plaintiffs complied with that request, and if so, where matters stand as to Defendant's attempt to document the construction of the home.  Presumably, after seven years, the process is complete.

As mentioned above, Defendant paid Plaintiffs $308,183.00 for actual cash value.  Defendant also paid Plaintiffs $165,750.00 (the policy limit) for the contents of the house, and $29,414.04 for living expenses.[6]  With regard to living expenses, Defendant paid for ten months[7] of living expenses, maintaining that the house could have been rebuilt in that period.  Plaintiffs, however, have continued to submit claims to Defendant for additional living expenses, which Defendant has denied.

Contrary to Defendant's contention that the house could have been rebuilt in ten months, Plaintiffs maintain that Defendant has prevented them from rebuilding, by paying them too little for actual cash value, and by refusing to negotiate an estimate for replacement cost.  As for actual cash value, Plaintiffs set the figure at $453,684.00.[8]

---

[6]Altogether, to date, Defendant has paid Plaintiffs $503,347.04 under the policy.

[7]Plaintiffs contend that Defendant still owes them for some expenses incurred during that ten-month period.

[8]Plaintiffs' Supplemental Answers to Defendant's First Set of Interrogatories, No. 5; Stoerger Damages Report, Berger Aff., Ex. D.

Consequently, Plaintiffs contend that Defendant underpaid them for actual cash value by $145,501.00. Plaintiffs maintain that, because of this, they did not have a sufficient down payment to obtain a construction loan to rebuild the house:

> The actual cash value paid to us by Erie in November 2003 was woefully low and inadequate for us to rebuild. The amount paid did not provide us with the financial wherewithal to rebuild our house with materials of like kind and quality. By the time the mortgagee, Countrywide Home Loans, and other expenses were paid off, there was not enough money available for us to qualify for a mortgage loan sufficient to rebuild the house as it was before the fire. My wife and I had been able to save a substantial amount of money in building the house originally because I personally acted as the general contractor. I could not do that again, however, because of the sheer amount of time and stress involved in doing so.

Woodworth Aff. [#85-13] at ¶ 16. Similarly, with respect to replacement cost, in August 2004, Plaintiffs wrote to Defendant's counsel, and stated:

> [We] can not replace a house that will cost $553,896 to build with funds of only $308,183 provided by Erie without agreement on additional settlement funds. The house can not be built to 'equivalent construction' with materials of like kind and quality as for provided [sic] in the policy with Erie Insurance's offer.

Woodworth Aff. [#17-3], Ex. J; *see also*, Woodworth Aff. [#85-13] at ¶ 16 ("In addition ... my wife and I have not replaced or rebuilt the house as yet because Erie has failed and refused to acknowledge the proper replacement cost."). Plaintiffs' public adjuster, Eric Stoerger ("Stoerger"), agrees that it was not feasible for Plaintiffs to rebuild without an agreement from Defendant concerning replacement cost:

> A. The insured[s] couldn't enter into a contract to restore their house until they had an agreed amount to be paid to them when and if they complied with the replacement cost requirements of the policy.
>
> Q. Did they indicate that to you personally?
>
> A. Yes. And it's common sense, yes.

Q. What do you mean by 'common sense'?

A. An insured who believes his house is going to cost an amount greater than $381,000 to reconstruct is not going to enter into a contract in excess of that unless the numbers get agreed to and the missing items get addressed. That would be foolhardy.

Stoerger Dep. 52.

On June 30, 2005, Plaintiffs commenced this diversity action. The Amended Complaint [#5] purported to state three separate claims: 1) a claim for specific performance of the appraisal provision; 2) a claim for breach of contract; and 3) a claim for punitive damages based on Defendant's bad faith. As for the breach of contract claim, Plaintiffs alleged that Defendant breached the policy in several respects: 1) by failing to pay the correct actual cash value and replacement value of the home; 2) by failing to follow the appraisal clause; and 3) by failing to pay Plaintiffs the cost of their living expenses, for the period of June 16, 2004 onward. Specifically as to the alleged breach of the appraisal provision, the Amended Complaint states, in pertinent part:

WOODWORTH has demanded an appraisal to resolve the dispute over the amount of loss and damage and to determine the Actual Cash Value and Replacement Cost of the loss and the amount due for Additional Living Expenses.
***
ERIE has refused to proceed with appraisal[.] WOODWORTH has repeated its demand to proceed to appraisal[.] In accordance with the appraisal clause, WOODWORTH has named its appraiser[.]

Amended Complaint, ¶ ¶ 7, 9-10. With regard to the claim for underpayment, the Amended Complaint states, in pertinent part: "By failing to pay Woodworth under the Policy to the full extent of the loss, including but not limited to Additional Living Expenses, Erie has breached its obligations under the policy." *Id*. at ¶ 17.

Defendant subsequently made a motion to dismiss parts of the Amended

Complaint. Notably, Defendant's moving papers suggested that Plaintiffs had previously sought an appraisal only with regard to replacement cost. *See, e.g.*, Cercone Aff. [#13-1], ¶ ¶ 7-8 ("[P]laintiffs, through their public adjuster, demanded that Erie submit to an appraisal to resolve the dispute over the anticipated *replacement cost value* of plaintiffs' sfire damage. Erie rejected plaintiffs demand for appraisal because plaintiffs had not yet submitted a replacement cost claim to Erie, and there were issues relating to the scope of plaintiffs' damages estimate.") (emphasis added); *see also, id*. At ¶ 20 ("[P]laintiffs [have] failed to meet the preconditions necessary to invoke the appraisal process. Namely, they have failed to submit a bona fide *replacement cost* claim[.]") (emphasis added); *id*. at ¶ 32 ("Plaintiffs' **public adjuster** specifically requested appraisal with respect to replacement cost **only**.") (emphasis in original). Additionally, Defendant argued that an insured could not maintain an action for specific performance of an appraisal clause under New York Law. Defendant further argued that the breach of contract claim pertaining to appraisal should fail, because Plaintiffs had not actually repaired or replaced their home. *Id*. at ¶ 24. As for Plaintiffs' claim for punitive damages based on bad faith, Defendant argued that the claim failed, pursuant to *Rocanova v. Equitable Life Assurance Society of the United States*, 83 N.Y.2d 603, 613, 612 N.Y.S.2d 339 (1994): "The minimum pleading requirements established by the *Rocanova* court require plaintiffs to establish that the conduct complained of was directed against the public at large, and that the defendant breached some duty to them that transcended the insurance contract." Cercone Aff. [#13-1] ¶ 41. Defendant further argued that Plaintiff had not pleaded a claim for bad faith, since there was no allegation of "tortious conduct." Def. Memo of Law [#14] at 14.

As mentioned above, Defendant, in its motion to dismiss, indicated that Plaintiffs had challenged only Defendant's replacement cost estimate, and not its actual cash value estimate. The Court observes that this representation, while perhaps technically correct in some small part, is incomplete and gives an inaccurate description of what happened. In that regard, Plaintiffs' public adjuster may have indicated, at one point, that Plaintiffs were not contesting actual cash value.[9] In response, Defendant's attorney, subsequent to receiving correspondence from Plaintiffs and their public adjuster, and subsequent to meeting with the adjuster, wrote to Plaintiffs, and stated that he was aware that Plaintiffs had been challenging the actual cash value, but that it appeared they were abandoning that claim:

> I [asked your public adjusters] for a Broad Evidence Rule analysis of the dwelling's actual cash value, but they indicated that they did not plan to submit any actual cash value figures on your behalf. . . . [Y]ou both accepted and cashed Erie's payment of over $308,000 for the actual cash value of the structure at the time of the loss, and your public adjusters advised me and several Erie representatives on October 7, 2004, that you have no plans to contest this figure. . . . Your letter requests information concerning the manner in which Erie's actual cash value figure was calculated. *At our meeting on October 7, 2004, your public adjusters, Mr. Stoerger and Mr. Papa, indicated that you did not plan to submit any actual cash value figures of your own and that you did not plan to contest the actual cash value payments that you have accepted from Erie.* Since your letter was dated the day before our meeting, I assume that the latter conversation will govern and that you do not wish to reopen the issue of the actual cash value payment at this time. If I am incorrect in this regard, please allow this letter to reiterate my long-standing demand for any further information that you or your public adjusters may have or may wish to provide regarding the calculation of actual cash value. As of this writing, as you know, Erie Insurance has received absolutely nothing from you or National Fire Adjustment with regard to the actual cash value

---

[9]The record indicates that on October 7, 2004, Stoerger sent a letter to Defendant, demanding an appraisal "of the above captioned loss as it relates to the replacement cost of the building, landscaping and hardscaping." However, as discussed below, Plaintiffs subsequently demanded appraisals as to both actual cash value and replacement cost.

component of the claim.

Woodworth Aff. [#17-3], Ex. L, Rupp letter dated October 13, 2004 (emphasis added).

In response to this very letter, Plaintiff Mr. Woodworth stated:

> Fifthly, my public adjuster informed you and the Erie representatives at the October 7, 2004 meeting that *I have not agreed to Erie's actual cash value*.
>
> Lastly, you have not made a formal request for actual cash value [evidence] until the October 7, 2004 meeting. Although ACV is a moot point as I am replacing the house, NFA [National Fire Adjusters] will be forwarding information to you under a separate cover. I hope this will resolve Erie's ongoing ACV issues so we can move forward on the replacement cost settlement.

Scott Woodworth Aff. [#17-2], Ex. M (emphasis added). Subsequently, Plaintiffs provided additional information to Defendant regarding actual cash value. *See, id*. [#17-2], Ex. M, Broad Evidence Valuation (showing two different estimates of actual cash value, "Replacement Cost Less Depreciation" and "Market Value" method, with overall estimated actual cash value of $418,329.00). Mr. Woodworth subsequently indicated, in a letter to Defendant's counsel, that "the total replacement cost is $545,607 and the total loss actual cash value is $453,608." *Id.* On January 17, 2005,[10] Defendant's counsel again acknowledged that Plaintiffs were disputing Defendant's actual cash value calculation. *Id*., letter of Anthony Rupp dated January 17, 2005, p. 2, 3. Moreover, subsequently, Plaintiffs' attorney, Mr. Begier, clearly requested appraisal as to *both* actual cash value *and* replacement cost, as the Court has shown above. Consequently, the record strongly belies any suggestion that Plaintiffs accepted Defendant's calculation of actual cash value.

---

[10]The main heading of the letter indicates a date of January 17, *2004*, but the letter otherwise clearly indicates, in multiple places, that it was written on January 17, 2005.

In any event, in opposition to Defendant's motion to dismiss, Plaintiffs cross-moved for summary judgment on their first cause of action, seeking a declaratory judgment requiring Defendant to comply with the policy's appraisal provision.  As part of their cross-motion, Plaintiffs reiterated that they were challenging Defendant's computation of actual cash value, in addition to the computation of replacement cost, as part of this action. *See, Scott Woodworth Aff.* [#17-2] @ ¶ 7 ("I pointed out [to Erie], as I had before, . . . that too much depreciation had been applied in arriving at actual cash value."); Memo of Law [#17-6] at 6, 26 (Indicating that Defendant "deducted too much depreciation" in arriving at actual cash value).  On the other hand, Plaintiffs withdrew their third cause of action, for bad faith.  In that regard, Plaintiff's acknowledged that under New York law, bad faith claims against insurance companies were difficult to prove, and that a separate lawsuit against Defendant in Pennsylvania might have a better chance of success. *Id*. at 27.

On January 18, 2006, the Court issued a Decision and Order [#23], granting Defendant's motion to dismiss in part, and denying Plaintiff's cross-motion for summary judgment.  The Court dismissed Plaintiff's first cause of action, finding that, under New York State law, an insured cannot obtain specific performance of an appraisal clause in a fire insurance policy.[11]

---

[11] The Court based its ruling on the decision of the New York State Supreme Court, Appellate Division Fourth Department, in *Fahrenholz v. Security Mut. Ins. Co.*, 291 A.D.2d 876, 738 N.Y.S.2d 623 (4th Dept. 2002), which interpreted Insurance Law § 3404(g) and CPLR § 7601.  The Court observes, however, that subsequently, effective March 30, 2010, the State of New York amended Insurance Law § 3404(g) and CPLR § 7601, to allow the parties to an insurance contract to bring an action for specific performance of an appraisal clause in a fire insurance policy. *See*, 2010 Sess. Law News of N.Y. Ch. 25 (s. 2088-A). The legislature apparently acted on the statement by the Court in *Fahrenholz*, that "further legislative action [was] required" to eliminate the tension between Insurance Law § 3404(g) and CPLR § 7601.

As for Plaintiff's second cause of action, "[t]he Court agree[d] with defendant that the claim for breach of the appraisal clause must fail as a matter of law, *since plaintiffs have not repaired or replaced their home*." *Id*. at 10 (emphasis added). From this, it is clear that the Court was referring to an appraisal concerning replacement cost, not actual cash value.

The Court points out this fact because, regrettably, at the conclusion of that discussion, the Court used overbroad language, and stated, "Defendant's motion to dismiss *the breach of contract claim based on the appraisal clause* is therefore granted." *Id*. at 11 (emphasis added). In this regard, the Court mistakenly indicated that Plaintiffs could not maintain a claim for breach of the appraisal clause as to either actual cash value or replacement cost. The Court did not discover this error until it reviewed the record in connection with the pending motions. However, the Court now clarifies that, in granting Defendant's motion to dismiss, insofar as it was directed at the second cause of action, for breach of contract, it dismissed only that portion of the Amended Complaint that alleged a breach of contract based on Defendant's refusal to engage in the appraisal process with respect to the *replacement cost* claim. Plaintiffs' claim for breach of contract based on Defendant's alleged failure to engage in the appraisal process with regard to *actual cash value* was not dismissed, and remains a part of this action.

More importantly, after conducting extensive legal research in connection with the pending application for partial summary judgment, the Court has concluded that it was mistaken in dismissing Plaintiffs' breach of contract claim based on Defendant's alleged failure to engage in the appraisal process with respect to *replacement cost*. In

that regard, in its earlier Decision and Order, the Court stated:

> Defendant also moves to dismiss the portion of plaintiffs' second cause of action for breach of contract, which alleges that defendant has breached the insurance contract by "failing and refusing to engage in the appraisal process set forth in the Policy." Amended Complaint [# 5] ¶ ¶ 17-18. The Court agrees with defendant that the claim for breach of the appraisal clause must fail as a matter of law, since plaintiffs have not repaired or replaced their home. In that regard, it is settled law in New York that, "[r]eplacement cost coverage inherently requires a replacement (a substitute structure for the insured) and costs (expenses incurred by the insured in obtaining the replacement); without them, the replacement cost provision becomes a mere wager." *Harrington v. Amica Mut. Ins. Co.*, 223 A.D.2d 222, 228, 645 N.Y.S.2d 221 (4th Dept.1996) (Wesley, J.); *see also, DeLorenzo v. Bac Agency Inc.*, 256 A.D.2d 906, 907, 681 N.Y.S.2d 846, 848 (3d Dept.1998) ("[P]laintiff failed to satisfy the condition precedent of rebuilding".). Plaintiffs contend that these cases refer only to the insurer's duty to pay, and that the insured need not actually rebuild before invoking the appraisal clause. However, the Court disagrees, since the amount of loss, if any, attributable to repairing or replacing the home cannot be determined until the repair or replacement is completed. Consequently, no appraisal of such a loss can be performed until after the repair or replacement occurs. Defendant's motion to dismiss the breach of contract claim based on the appraisal clause is therefore granted.

*Woodworth v. Erie Ins. Co.*, No. 05-CV-6344 CJS, 2006 WL 140708 at * 5 (W.D.N.Y. Jan. 17, 2006). The Court now believes that this analysis was incorrect, and that the law in New York State was more accurately stated by Judge Mukasey as follows:

> [A]lthough actual replacement is a condition precedent to *collecting* replacement proceeds, it is not a condition precedent to *valuing* hypothetical replacement cost[.] . . . To the contrary, the facts underlying several cases demonstrate that hypothetical replacement cost is routinely calculated prior to the determination of whether a policyholder is entitled to recover replacement cost. *See, e.g., D.R. Watson Holdings, LLC v. Caliber One Indem. Co.*, 15 A.D.3d 969, 969, 789 N.Y.S.2d 787, 787 (4th Dep't 2005); *Harrington v. Amica Mut. Ins. Co.*, 223 A.D.2d 222, 224, 645 N.Y.S.2d 221, 222 (4th Dep't 1996); *Kumar [v. Travelers Ins. Co.]*, 211 A.D.2d [128,] 130, 627 N.Y.S.2d at 186[.] . . . This timing makes sense because the early calculation of hypothetical replacement cost informs the insured of the upper limit on the funds available for rebuilding and can thus influence the insured's decision as to whether and how to rebuild.

*SR Intern. Business Ins. Co. Ltd. v. World Trade Center Properties, LLC*, 445 F.Supp.2d 320, 333 (S.D.N.Y. 2006) (emphasis added, citations omitted). Additionally, New York Insurance Law § 3404 provides that fire insurance policies must provide for appraisal, if the parties "fail to agree as to the actual cash value or *the amount of loss*." (Emphasis added). Here, with regard to replacement cost, the amount of loss is the cost to replace the house, which is what Plaintiffs seek to have appraised. While rebuilding the house may be a condition precedent to payment, it is not a condition precedent to valuation of the loss.

Defendant clearly cannot claim that it is incapable of calculating estimated replacement cost, since it already did so as part of its calculation of actual cash value. Mowins Aff., Ex. A. Moreover, Plaintiffs generally accept the basis of Defendant's replacement value calculation, namely, Scofero's estimate, though they maintain that the estimate is incomplete. Nevertheless, it would appear to be a relatively simple matter to determine whether, in fact, Scofero's estimate correctly valued the twenty-nine or thirty items which Plaintiffs dispute – the appliances and materials were either in the house at the time of the fire, or they weren't. Plaintiffs have provided documentation requested by Defendant, and Defendant purportedly spent months gathering additional information. To the Court's knowledge, Defendant does not claim that it still needs additional information. Accordingly, it is unclear why Defendant does not either amend its estimate, or explain to Plaintiffs exactly why it is refusing to do so. In any event, again, the Court finds that this is a disagreement over "amount of loss," which is covered by the policy's appraisal provision.

Consequently, the Court *sua sponte* amends its prior Decision and Order [#23],

and denies Defendant's motion to dismiss that portion of Plaintiffs' second cause of action which alleged a breach of contract based on Defendant's alleged failure to engage appraisal with regard to replacement cost. Consequently, Plaintiffs' claims in this action are for breach of contract, involving: 1) Defendant's alleged failure to pay the correct amounts for actual cash value and additional living expenses; and 2) Defendant's alleged failure to engage in the appraisal process with regard to actual cash value *and* replacement cost.

Following a period of pretrial discovery, on April 2, 2010, Defendant filed the subject motion [#82] for partial summary judgment. Defendant contends that, under the policy terms set forth above, it is entitled to summary judgment on Plaintiffs' claim for additional living expenses, to the extent that Plaintiffs seek such expenses for any period more than ten months after the loss, since the house could have been rebuilt within ten months. On this point, Defendant relies upon an affidavit from Scofero, in which he states that the house could have been rebuilt in ten months. Alternatively, Defendant contends that, under the policy terms above, it is entitled to summary judgment on any claim for additional living expenses incurred more than twelve months after the loss, since the policy limit for additional living expenses is twelve months.

In opposition, Plaintiffs contend that they are entitled to recover all of their additional living expenses to date, notwithstanding the twelve-month limitation imposed on such expenses in the policy. In that regard, Plaintiffs maintain that Defendant breached the policy, by failing to pay them the actual cash value for the loss, which prevented them from rebuilding their home, which, in turn, caused them to incur additional living expenses beyond the 12-month deadline described in the policy.

Plaintiffs state that, because of such breach, they could not rebuild the house within ten months or twelve months after the loss. *Id*. at ¶ 18. Plaintiff's further argue that their additional living expenses are recoverable as consequential damages under *Bi-Economy Market, Inc. v. Harleysville Ins. Co. Of New York*, 10 N.Y.3d 187, 856 NYS2d 505 (2008) ("*Bi-Economy*"). Additionally, Plaintiffs contend that the Court should strike that portion of Scofero's affidavit in which he avers that the house could have been rebuilt in ten months, since Defendant did not properly disclose such opinion during discovery. Finally, Plaintiffs maintain that the Court should deny Defendant's motion as untimely.

ANALYSIS

*Rule 56*

Summary judgment may not be granted unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists. *See, Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). "[T]he movant must make a prima facie showing that the standard for obtaining summary judgment has been satisfied." 11 MOORE'S FEDERAL PRACTICE, § 56.11[1][a] (Matthew Bender 3d ed.). "In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant may satisfy this burden by pointing to an absence of evidence to support an essential element of the nonmoving party's claim." *Gummo v. Village of Depew*, 75 F.3d 98, 107 (2d Cir. 1996)(*citing Celotex Corp. v. Catrett*, 477

U.S. 317, 322-23 (1986)), cert denied, 517 U.S. 1190 (1996).  Once that burden has

been established, the burden shifts to the non-moving party to demonstrate "specific

facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e);  *Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).  To carry this burden, the non-moving

party must present evidence sufficient to support a jury verdict in its favor. *Anderson*,

477 U.S. at 249.  The parties may only carry their respective burdens by producing

evidentiary proof in admissible form. Fed. R. Civ. P. 56(e).  The underlying facts

contained in affidavits, attached exhibits, and depositions, must be viewed in the light

most favorable to the non-moving party. *U.S. v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

However, it is well settled that the party opposing summary judgment may not create a

triable issue of fact "merely by submitting an affidavit that disputes his own prior sworn

testimony." *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996)(citations omitted).

Rather, such affidavits are to be disregarded. *Mack v. United States*, 814 F.2d 120, 124

(2d Cir. 1987) (citations omitted).  Summary judgment is appropriate only where, "after

drawing all reasonable inferences in favor of the party against whom summary

judgment is sought, no reasonable trier of fact could find in favor of the non-moving

party." *Leon v. Murphy*, 988 F.2d 303, 308 (2d Cir.1993).

*Timeliness of Defendant's Motion*

At the outset, the Court will consider whether Defendant's motion should be

denied as untimely.  In that regard, in August 2008, the Honorable Marian W. Payson,

United States Magistrate Judge, ordered that dispositive motions in this case be filed by

June 1, 2009.  On May 29, 2009, the Court entered an order, holding in abeyance the

deadline for filing dispositive motions, until "after the Court rules on Plaintiffs' motion for

leave to amend their complaint." Order [#76]. The Order did not specify how soon dispositive motions should be filed after the resolution of the motion to amend. On October 29, 2009, the Court issued a Decision and Order [#81], resolving the motion to amend. The Decision and Order did not re-set the deadline for filing dispositive motions, nor did the parties request a new scheduling order. Some five months later, Defendant filed the subject motion for partial summary judgment, and Plaintiffs now contend that the motion is untimely. The Court disagrees, since no new scheduling deadline was ever established. Accordingly, Plaintiffs' request to deny Defendant's motion as untimely is denied.

*Request to Strike Scofero's Opinion*

Next, the Court will consider whether Scofero's affidavit should be stricken, insofar as it opines that Plaintiffs' house could have been rebuilt in ten months. On or about March 16, 2009, Defendant served Plaintiff with its expert witness disclosure concerning Scofero. Berger Aff., [#85-2], Ex. A. The disclosure indicated that Scofero would testify "regarding his estimate for the reconstruction" of Plaintiffs' home, and specifically, "his estimate of the *cost* to rebuild the insured premises." *Id*. (Emphasis added) The disclosure further stated that "[a]ll opinions to be expressed by Mr. Scofero and the bases and reasons therefore" were contained in his construction estimate. *Id*. Scofero's estimate, however, did not indicate how long it would take to rebuild the house. In support of Defendant's motion for partial summary judgment, Scofero now indicates that the house could have been rebuilt in ten months.

A party may not ordinarily defeat a summary judgment motion using information that was not disclosed during discovery. FRCP 26(a)(2)(B) governs the disclosure of

expert reports, and requires, *inter alia*, that such reports state "all opinions the witness will express and the basis and reasons for them."  FRCP 37 (c)(1) provides a sanction if a party fails to disclose information as required by Rule 26(a), stating that "the party is now allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless."  A district court has discretion whether to exclude such evidence:

> In determining whether the district court acted within its discretion, [the Second Circuit] considers (1) the party's explanation for the failure to comply with the disclosure requirement; (2) the importance of the testimony of the precluded witness; (3) the prejudice suffered by the opposing party as a result of having to prepare to meet the new testimony; and (4) the possibility of a continuance.  The purpose of the rule is to prevent the practice of 'sandbagging' an opposing party with new evidence.  Although a 'bad-faith' violation of Rule 26 is not required in order to exclude evidence pursuant to Rule 37, it can be taken into account as part of the party's explanation for its failure to comply.

*Haas v. Delaware and Hudson Ry. Co.*, No. 07-1198-cv, 282 Fed.Appx. 84, 86, 2008 WL 2566699 at *2 (2d Cir. Jun. 24, 2008) (citations and internal quotation marks omitted).  "This analysis requires the district court to consider the importance of the testimony to the case, the prejudice to the party inconvenienced, and the administrative difficulty which the court itself would face." *Outley v. City of New York*, 837 F.2d 587, 590 (2d Cir. 1988).  Moreover,

> [b]efore the extreme sanction of preclusion may be used by the district court, a judge should inquire more fully into the actual difficulties which the violation causes, and must consider less drastic responses.  Considerations of fair play may dictate that courts eschew the harshest sanctions  where failure to comply is due to a mere oversight of counsel amounting to no more than simple negligence.

*Id.*, 837 F.2d at 591 (citation and internal quotation marks omitted).  On the other hand, where a party fails to disclose information in response to discovery demands, fails to

explain such failure, and never asks to reopen discovery, a court does not abuse its discretion in precluding the evidence. *Haas v. Delaware and Hudson Ry. Co.*, 282 Fed.Appx. at 86-87, 2008 WL 2566699 at *2-3.

In this case, Defendant contends that it "properly disclosed Mr. Scofero as an expert witness," and that FRCP 26(a)(2) only requires a party to disclose expert opinions that it intends to use *at trial*. Defendant Reply Memo [#87] at 7. Defendant contends, therefore, that it had no "duty to disclose information related to expert witnesses it may use in support of pre-trial motions. *Id*. On this point, Defendant is clearly incorrect. As mentioned above, FRCP 37 (c)(1) states that a party who fails to disclose information as required by Rule 26(a) may be precluded from using such evidence "on a motion, at a hearing, or at a trial." Defendant has not shown that its failure was substantially justified, and the information is obviously important and prejudicial to Plaintiffs. Scofero's opinion, that the house could have been rebuilt in ten months, is therefore stricken. Consequently, Defendant's motion for partial summary judgment is denied, to the extent that it seeks to limit Plaintiffs to ten months of additional living expenses.[12]

*Living Expenses Incurred More Than Twelve Months After the Loss*

The Court will now consider that portion of Defendant's motion, which seeks a determination that Plaintiffs cannot recover living expenses incurred more than twelve months after the loss. In that regard, Defendant maintains that twelve months is the

---

[12] Plaintiffs do not argue that they could not have rebuilt the house in ten months. Instead, they maintain that Defendant prevented them from rebuilding. There are issues of fact as to whether Defendant prevented Plaintiffs from rebuilding, by failing to pay them the correct amount for actual cash value and by failing to honor the policy's appraisal clause. Consequently, even if the Court did not strike Scofero's affidavit, it would deny Defendant's motion insofar as it seeks to limit Plaintiffs to ten months of additional living expenses.

24

policy limit for such expenses. Plaintiffs, however, contend that the additional living expenses that they seek beyond twelve months were "incurred by reason of [Defendant's] breach of the policy in failing to pay proper actual cash value for the loss," and that questions of fact exist as to whether Defendant breached the policy, and whether Plaintiffs "could have repaired or replaced their house within 10 months or 12 months." Pl. Memo [#85-16] at 2.

There appear to be issues of fact as to whether Defendant paid Plaintiffs the correct actual cash value amount, and whether Defendant breached the appraisal clause with regard to actual cash value and replacement value. The issue presented by the instant motion, though, is whether, as a matter of law, Plaintiff can recover additional living expenses beyond the twelve-month policy limit. Plaintiffs maintain that those expenses are recoverable, "as extracontactual consequential damages in that they were within the reasonable contemplation of the parties at the time the policy was issued as the probable result of [Defendant's] breach." Pl. Memo [#85-16] at 11. On this point, Plaintiffs rely almost exclusively on the companion cases of *Bi-Economy* and *Panasia Estates, Inc. v. Hudson Ins. Co.*, 10 N.Y.3d 200, 856 N.Y.S.2d 513 (2008) ("*Panasia Estates*"), which were decided on the same day by the New York Court of Appeals.

In *Bi-Economy* and *Panasia Estates*, the New York Court of Appeals held that "consequential damages resulting from a breach of the covenant of good faith[13] and fair

<hr />

[13] To prevail on a claim for consequential damages under *Bi-Economy*, the insured must establish that the insurer breached the implied duty of good faith. The Second Circuit has described New York's implied "duty of good faith in insurance policies as follows: "Generally speaking, good faith imposes a duty on the company to act in accordance with standards of honesty, and in a manner faithful to its obligations." *Pinto v. Allstate Ins. Co.*, 221 F.3d 394, 396 (2d Cir. 2000). However, not every breach of a policy implicates this implied duty. For example, in the context of claim for refusal to settle, "[t]he duty to act in

dealing may be asserted in an insurance contract context, so long as the damages were within the contemplation of the parties as the probable result of a breach at the time of or prior to contracting." *Panasia Estates*, 10 N.Y.3d at 203 (citation omitted). Further, these decisions held that, in such a case, a "contractual exclusion for consequential loss does not bar the recovery of consequential damages." *Id*. With regard to the duty of good faith, as it pertains to claims such as those asserted in this case, the Court of Appeals stated that, "a reasonable insured would understand that the insurer promises to investigate in good faith and pay covered claims." *Bi-Economy*, 10 N.Y.3d at 194. As for whether consequential damages were reasonably contemplated by the parties, the Court in *Bi-Economy* stated:

> To determine whether consequential damages were reasonably contemplated by the parties, courts must look to the nature, purpose and particular circumstances of the contract known by the parties as well as what liability the defendant fairly may be supposed to have assumed consciously, or to have warranted the plaintiff reasonably to suppose that it assumed, when the contract was made. Of course, proof of consequential damages cannot be speculative or conjectural.

*Id*. at 193 (citations and internal quotation marks omitted).

In *Bi-Economy*, the insured purchased business insurance, pursuant to which the insurer promised to pay the replacement cost of the insured's building, as well as coverage for the building's contents, including inventory, and losses attributable to interruption of business for a period of up to twelve months. *Id.*, 10 N.Y.3d at 191. However, the insurer initially paid the insured less than half of the correct amount for the building and contents, and paid for only seven months of business interruption

---

good faith is not breached by an insurer's conduct that amounts to a mistake in judgment or negligence. Instead, a plaintiff must establish that the insurer's actions displayed a 'gross disregard' of its policyholder's interests." *Id*. at 399 (citation omitted).

expenses.  *Id*.   The plaintiff-insured sued the insurer for breach of contract, seeking

consequential damages for "the complete demise of its business operation." *Id*.  As to

that, the insured alleged that the insurer's breach of the policy caused the insured's

entire business to fail.  *Id*.  The Court of Appeals held that the insured could sue to

recover consequential damages for the loss of its business, since such damages were

reasonably foreseeable and within the contemplation of the parties when they

contracted:

> The purpose served by business interruption coverage cannot be clearer – to ensure that Bi-Economy had the financial support necessary to sustain its business operation in the event disaster occurred.  Thus, the very purpose of business interruption coverage would have made Harleysville aware that if it breached its obligations under the contract to investigate in good faith and pay covered claims it would have to respond in damages to Bi-Economy for the loss of its business as a result of the breach.

*Id*., 10 N.Y.3d at 195 (citations omitted).

In this case, the clear purpose of the insurance policy was to insure that

Plaintiffs' house would be rebuilt or replaced promptly, and that in the meantime,

Plaintiffs would not have to pay additional living expenses while the old house was

uninhabitable.  The policy appears to envision that such repair or replacement would

occur in twelve months or less, and the parties do not dispute that such repair or

replacement could have been completed within that time.  Rather, they disagree as to

the reason why it did not occur.  Viewing the evidence in the light most-favorable to

Plaintiffs, as the Court must on this summary judgment application, the only reason that

this did not occur is that Defendant breached the policy.[14]   Further viewing the

evidence in this manner, such breach caused Plaintiffs to incur the additional living

expenses for which they are seeking reimbursement.  Applying the reasoning from *Bi-*

*Economy*, the very purpose of additional living expense coverage would have made

Defendant aware that if it failed to act in good faith, and breached the policy in such a

way as to hinder Plaintiffs from rebuilding their home, it would cause Plaintiffs to incur

additional living expenses until such time as the house was replaced.  Consequently,

the Court finds that, pursuant to *Bi-Economy*, Plaintiffs could potentially pursue their

claim for additional living expenses as consequential damages, and that Plaintiffs would

not be barred from doing so by the policy's twelve-month limit on such expenses.

Defendant contends, however, that the Court has already rejected Plaintiffs'

claim for consequential damages. Def. Reply Memo at 5-6 ("The Court has already

decided that Plaintiffs are not entitled to consequential damages.").  Defendant argues,

on this point, that the Court denied Plaintiffs' motion to file a second amended

---

[14]Viewing the evidence in the light most-favorable to Plaintiffs, Defendant refused to honor the appraisal provision, significantly underpaid Plaintiffs for actual cash value, and refused to negotiate an estimated replacement cost.  According to Plaintiffs, such actions by Defendant *in fact* made it impossible for them to rebuild their home.  On this point, Plaintiffs maintain that the underpayment of actual cash value made it impossible for them to afford a down payment, which they otherwise would have been able to afford, and that in any event, they could not contract to rebuild their house without some agreement from Defendant as to replacement cost.  In finding this evidence sufficient to create a triable issue of fact, the Court is not indicating that an insurer's underpayment of actual cash value necessarily prevents an insured from rebuilding, which is a condition precedent to payment of replacement cost.  In that regard, it is the law in New York that a complete failure to pay actual cash value, which prevents the insured from rebuilding or replacing, may excuse the insured from performing the condition precedent of rebuilding or replacing. *See, Zaitchick v. American Motorists Ins. Co.*, 554 F.Supp. 209, 217 (S.D.N.Y. 1982), *aff'd* 742 F.2d 1441 (2d Cir. 1983), *cert den.* 464 U.S. 851, 104 S.Ct. 162 (1983).   However, actual cash value does not necessarily provide an insured with the means to rebuild. *See, SR International Bus. Ins. Co. Ltd. V. World Trade Center Properties, LLC*, 407 F.Supp.2d 587, 590-591 (S.D.N.Y. 2006) (Observing that, among other reasons for this, because of the delay that may be occasioned by the appraisal process, "[t]he notion that ACV is in general a reliable source of early payment to jump-start rebuilding efforts is simply unrealistic.").  Therefore, proof of underpayment of actual cash value does not necessarily create an issue of fact as to whether an insurer prevented an insured from rebuilding.

complaint, in which they were attempting to expressly add a claim for consequential damages under *Bi-Economy*.

Defendant is correct that the Court denied Plaintiffs' motion to amend, though it is mistaken in stating that the Court "decided that Plaintiffs are not entitled to consequential damages." Although the Court denied Plaintiffs' motion to amend, it did so because the motion was untimely, not because Plaintiffs were not otherwise entitled to seek consequential damages. In fact, this Court never considered the merits of the claims that Plaintiffs were attempting to add. (Decision and Order [#81]). Nevertheless, the Court agrees that Plaintiffs' Amended Complaint, which is the operative complaint in this action, and which was drafted prior to the *Bi-Economy* decision, fails to state a claim for consequential damages. On this point, the Amended Complaint states only that,

> [b]y failing to pay [Plaintiffs] under the Policy to the full extent of the loss, including but not limited to Additional Living Expenses, Erie has breached it obligations under the Policy. By failing and refusing to engage in the appraisal process set forth in the Policy, Erie as breached its obligations under the Policy As a result of Erie's breach of the Policy, [Plaintiffs have] been damaged in an amount to be determined at trial, but exceeding the principal sum of $75,000.00, plus interest from August 8, 2003.

Amended Complaint ¶ ¶ 16-19 (paragraph numbers omitted). Even with liberal notice pleading standards, such allegations are insufficient to state a claim for consequential damages under *Bi-Economy*.

The Court is somewhat reluctant to grant Defendant's motion on this basis, since it is clear that Defendant knew, from the inception of this case, that Plaintiffs were seeking additional living expenses incurred beyond the twelve-month policy limit. For example, on October 6, 2006, Plaintiffs served their Answers to Defendants First Set of

Interrogatories, in which they stated that they were seeking additional living expenses beyond the twelve-month period contained in the policy:

> 13. Articulate the amount that plaintiffs claim they are owed for additional living expenses not paid by defendant to date, and provide the legal basis for plaintiffs' position that they are entitled to said amount from defendant.

> <u>Answer to 13</u>: $67,476 as of 8/27/06. Plaintiffs object to defendant's request that they state the legal basis for this claim. Without waiver of said objection, plaintiffs state that the policy provisions purporting to limit the recovery of additional living expenses to a 12 month period following the loss is not applicable in these circumstances because of Erie's breach in failing and refusing to pay plaintiffs the proper actual cash value for the loss.

Berger Aff. [#85-2] Ex. F at p. 6. Moreover, in its Reply Memo in support of the pending motion, Defendant stated, in pertinent part: "The insurance contract at issue in this case specifically limits coverage stemming from additional living expenses to 12 months or less. *Any claim for damages beyond the scope of this limit is a claim for consequential damages.*" Def. Reply Memo [#87] at 5-6 (emphasis added). By this, Defendant admits that it understood any claim for damages beyond the twelve-month limit as a claim for consequential damages. Nevertheless, the Amended Complaint fails to plead a claim for consequential damages. Consequently, Defendant is entitled to summary judgment on that portion of Plaintiffs' claim which seeks additional living expenses *beyond* twelve months after the loss.

## CONCLUSION

For the reasons discussed above, Defendant's motion for partial summary judgment [#82] is granted in part and denied in part. Defendant is granted summary judgment on that portion of Plaintiffs' claim which seeks additional living expenses beyond twelve months after the loss. Otherwise, Defendant's motion is denied.

Additionally, the Court *sua sponte* amends its prior Decision and Order [#23], and reinstates Plaintiff's claim for breach of contract, based on Defendant's alleged breach of the appraisal clause with regard to replacement cost.  The Court also clarifies that Plaintiff's claim for breach of contract, based on Defendant's alleged breach of the appraisal clause with regard to actual cash value, was not dismissed as part of the earlier Decision and Order [#23].

     So Ordered.

Dated: Rochester, New York
     September 21, 2010

                      ENTER:


                      /s/ Charles J. Siragusa
                      CHARLES J. SIRAGUSA
                      United States District Judge